IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH DON_ADCOCK2002@YAHOO.COM THAT IS STORED AT PREMISES CONTROLLED BY YAHOO | Misc. Case No. ____________________<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF SEARCH**
**WARRANT APPLICATIONS**[1]

I, Rebecca Freund, being duly sworn, depose and hereby state the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for search warrants for information associated with certain accounts that are stored at premises controlled by Comcast Communications LLC ("Comcast"), an electronic mail ("email") provider headquartered and accepting service at 650 Centerton Rd., Moorestown, NJ 08057; Google, an email provider headquartered and accepting service at 1600 Amphitheatre Parkway, Mountain View, CA 94043; and Yahoo!, Inc. ("Yahoo"), an email provider headquartered and accepting service at 701 First Ave., Sunnyvale, CA 94089. The email accounts to be searched, dupperman04@comcast.net, varehodc@gmail.com, cmurphy42o@gmail.com, cody.murphy302@gmail.com, don.adcock@gmail.com, donald.adcock.doe@gmail.com, and don_adcock2002@yahoo.com (hereinafter referred to collectively as the "Target Email Accounts"), are described in more detail in the following paragraphs and in Attachment A to the search warrants. This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Comcast, Google, and Yahoo to disclose to the government copies of the

---

1 An identical version of this affidavit, with the exception of a different caption, is being submitted to the Court for the other two providers of electronic mail accounts discussed herein.

information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am currently employed as a Special Agent with the United States Department of Energy ("DOE"), Office of Inspector General ("OIG"), in Las Vegas, Nevada. I have been employed by DOE OIG since November 2013 and before that as a Special Agent with another federal law enforcement agency since June 2001. As a Special Agent with DOE OIG, I am responsible for conducting criminal investigations of alleged violations of Title 18, United States Code ("USC"), as well as other violations of civil statutes and administrative misconduct. DOE OIG serves as an independent audit and investigative organization with the mission of strengthening the integrity, economy, and efficiency of DOE's programs and operations. I am currently assigned to the DOE OIG Office of Investigations, which performs investigations into allegations of misconduct, fraud, waste, and abuse in programs and operations of the DOE, National Nuclear Security Administration ("NNSA") and Federal Energy Regulatory Commission ("FERC").

3. I am a graduate of the Federal Law Enforcement Training Center's ("FLETC") Criminal Investigator Training Program ("CITP") and have attended numerous additional law enforcement training courses including courses on investigative methods and techniques, such as the recovery and use of electronic data evidence from email accounts, the internet, computers, and other electronic data sources. I also earned undergraduate and graduate college degrees including a Doctor of Philosophy ("PhD"). During my approximately fifteen years as a federal Special Agent, I have conducted and/or participated in hundreds of criminal investigations involving

violations of the federal criminal code. I have participated in the execution of many search and arrest warrants and have written affidavits in support of arrest and search warrants.

4. The statements in this affidavit are based on my personal knowledge, information obtained from DOE, from persons with knowledge regarding relevant facts, from law enforcement databases, as well as from the review of records and documents from various entities.

5. Because this affidavit is being submitted for the limited purpose of establishing probable cause in order to secure a warrant to search the Target Email Accounts belonging to Donald Adcock, Douglas Upperman, and Cody Murphy, listed in further detail in Attachment A, I have not included each and every fact known concerning this investigation.

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the following persons have committed the following violations: (1) Donald Adcock, while serving as a federal employee, participated personally and substantially in a matter affecting his personal financial interest, in violation of 18 U.S.C. § 208; (2) Donald Adcock and Douglas Upperman made false statements to law enforcement, in violation of 18 U.S.C. § 1001; (3) Donald Adcock made false statements in applications for mortgage loans, in violation of 18 U.S.C. § 1001, 18 U.S.C. § 1014, and 18 U.S.C. § 1343; and (4) Donald Adcock obtained a third party employment benefit for Cody Murphy through extortion under color of official right, in violation of 18 U.S.C. § 1951 (hereinafter referred to as the "Target Offenses"). There is also probable cause to search the information described in Attachment A for evidence,

instrumentalities, contraband or fruits of these crimes further described herein and in Attachment B.[2]

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC. *See* 18 U.S.C. § 3237. For example, Donald Adcock's DOE office was located at that agency's headquarters in Washington, D.C.; Adcock had conversations at the DOE's headquarters in Washington, D.C. with Sonja Green, a DOE employee who is discussed further herein, regarding the hiring and promotion of Douglas Upperman; and it appears, based on the investigation to date, that Adcock used his work computer at his office to send many of the emails from his DOE work email account discussed herein given that these emails were sent during regular work day hours and do not have statements in them indicating they were sent from a mobile device.

8. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service or execution of this warrant.

---

[2] Your affiant issued an OIG administrative subpoena for some of Adcock's financial records on or about February 18, 2015. Adcock appears to have retained counsel shortly thereafter. Accordingly, the search warrants sought herein do not seek emails past the date of February 18, 2015.

## PROBABLE CAUSE

### I. Overview of Subjects and their Relationships

#### A. Subjects' Employment History

9. Donald Adcock – Donald Adcock was born on or about February 5, 1968. According to Adcock's federal government electronic Official Personnel Folders ("eOPF"), he was employed by different agencies within the Department of Defense ("DOD") for several years. On or about April 8, 2012, Adcock transferred from a Senior Executive Service ("SES") position at DOD to the SES position of Associate Chief Information Officer ("ACIO") for Energy Information Technology Services at DOE. On or about January 27, 2013, Adcock was promoted to the SES position of Deputy Chief Information Officer ("DCIO") at DOE. On or about September 5, 2014, Adcock became the Acting Chief Information Officer ("CIO") at DOE. On or about April 2015, Adcock resigned from DOE and accepted employment with DOE's prime contractor for information technology ("IT") services, ActioNet, Inc. ("ActioNet"). As of approximately October 2016, Adcock remained employed by ActioNet in its office in Hawaii.

10. Douglas Upperman – Douglas Upperman was born on or about August 2, 1961. According to Upperman's eOPF, he was employed by different agencies within DOD for several years. On or about April 8, 2012, Upperman was employed at the Joint Improvised Explosive Device Defeat Organization ("JIEDDO") at DOD and was promoted from a GS-14 Training Simulation Analyst to a GS-15 Supervisory Training Instructor. On or about August 6, 2012, Upperman was changed to a lower grade and once again became a GS-14 Training Simulation Analyst. On or about July 8, 2013 through September 30, 2013, Upperman was furloughed by DOD. On or about April 20, 2014, Upperman transferred from a GS-14 DOD position to the GS-14 newly created position of Executive Officer within the Office of the Chief Information Officer

("OCIO") at DOE, and Adcock was his assigned supervisor. On or about December 18, 2014, Upperman was promoted to a newly created GS-15 Chief of Staff position within the OCIO, and Adcock was his assigned supervisor. Adcock remained Upperman's supervisor until approximately February 2015 when the DOE Ethics Official within the Office of General Counsel instructed Adcock to re-assign Upperman to a different supervisor after she determined Upperman was a member of Adcock's household. As of approximately October 2016, Upperman remained employed as a GS-15 at DOE.

11. As discussed further herein, it is your affiant's opinion based on the investigation to date that Adcock used his official DOE authority to arrange for and ultimately approve DOE's hiring of Upperman in April 2014. Similarly, Adcock made the decision to promote Upperman to the Chief of Staff position within the OCIO in December 2014. Adcock made these employment decisions on DOE's behalf even though Adcock and Upperman had a close personal and interconnected financial relationship for years. Furthermore, Adcock hired and promoted Upperman even though these actions affected Adcock's own personal finances by helping to ensure that he and Upperman – who were each severely in debt – could pay the bills and expenses for their joint residences in Virginia and later Maryland and their jointly owned vacation homes in Delaware and Nevada.

12. Cody Murphy – Cody Murphy was born on or about May 12, 1987. According to Murphy's resume, prior to March 2014, he was employed by private industry as a lead bartender at Don Pablos Mexican Kitchen and Café Caturra and subsequently as a tanning specialist at Solar Planet, and was taking college courses toward a degree in Human Services he expected to receive in June 2015. On or about March 3, 2014, Murphy began employment at ActioNet in a Technical Writer position billed to the company's DOE contract. In approximately June 2015 – after Adcock

had begun working at ActioNet's Hawaii office – Murphy was transferred by ActioNet to their Hawaii office. According to an executive at ActioNet, Murphy was transferred to Hawaii as part of the "deal" that was "brokered" for Adcock's employment.

13. As discussed further herein, it is your affiant's opinion based on the investigation to date that Adcock may have unlawfully extorted ActioNet to hire Murphy in exchange for Adcock's misuse of his official DOE position to arrange for a continuation of the company's approximately $775 million (as of September 2016) IT contract with DOE.

### B. The Personal and Financial Relationship Between Adcock and Upperman

14. The evidence gathered during the course of the investigation to date establishes that Donald Adcock and Douglas Upperman had a close personal and financial relationship from at least approximately 2005 to 2015. As explained in detail in subsequent paragraphs, Upperman and Adcock made each other beneficiaries of their federal employee benefits, listed each other as references in security clearance forms, referred to each other in emails by personal or intimate terms, were associated with the same addresses from approximately 2005 to 2015, purchased a primary residence and vacation homes together, and had at least one joint bank account they used to pay various bills.

15. Upperman signed a Federal Employees Retirement System ("FERS") beneficiary form on or about October 26, 2010 in which he named Adcock as a beneficiary. On or about that same date, October 26, 2010, Upperman named Adcock as a beneficiary for his Federal Employees Group Life Insurance ("FEGLI") benefits. Adcock signed a FERS beneficiary form on or about November 10, 2010 in which he named Upperman as a beneficiary. Adcock listed Upperman as a beneficiary on his unpaid compensation of deceased civilian employee form that was dated on

or about April 9, 2012. On or about April 21, 2014, Upperman named Adcock as a beneficiary on his unpaid compensation of deceased civilian employee form.

16. On or about April 18, 2014, Adcock submitted to DOE a signed SF86 Questionnaire for National Security Positions. The form asked for a person who knew him at his current address and Adcock listed Upperman. Another section on the SF86 form asked for the names of three individuals that knew him well, and Adcock listed Upperman.

17. A review of Adcock's DOE work email account resulted in the recovery of multiple email communications between Adcock and Upperman from approximately 2012 to 2015 in which Adcock referred to Upperman by terms that reflect a close personal relationship, such as "Beb," "babe," "Baby," and "honey." Adcock also told Upperman in emails "love you," and "I love and miss you." In these emails they discussed personal matters that suggested they resided together and had a close financial relationship during this time frame, such as groceries, meals, arrival times at home, and residence moving dates, as well as financial matters, such as bills, bank account money transfers, utilities, and property sales.

18. A review of records from DOE, Office of Personnel Management ("OPM"), multiple financial and credit institutions, and multiple state agency databases revealed that Upperman and Adcock lived together at the same primary residence locations from approximately 2005 to 2015 and purchased one of these primary residences together. Specifically, from approximately March 2005 to August 2006, they resided in a rental apartment located at 200 Luna Park Drive, #330, Alexandria, Virginia. From approximately August 2006 until December 2013, they resided at a jointly owned condominium located at 181 E. Reed Ave., #214, Alexandria, Virginia. They obtained a joint mortgage to purchase this condominium as a primary residence on or about August 8, 2006. They re-financed it on or about October 26, 2012. On or about December

18, 2013, Upperman and Adcock jointly sold the Virginia condominium and both received proceeds from the sale. On or about December 13, 2013, Adcock solely obtained a mortgage to purchase a single family residence located at 8904 Nancy Lane, Fort Washington, Maryland. Evidence gathered in the investigation to date indicates that Upperman and Adcock resided at this Maryland residence from approximately December 2013 until 2015.

19. Records also revealed that Adcock and Upperman jointly owned a timeshare property in Florida from approximately 2007 to 2008, a timeshare property in Nevada from approximately 2008 to the present, and a second home in Rehoboth Beach, Delaware from approximately 2011 to 2015. Specifically, on or about November 26, 2007, Upperman and Adcock transferred the equity in a Wyndham Hawaii Waikiki Beach Walk timeshare property that was solely in Upperman's name to the purchase of a jointly financed timeshare and associated Fairplus membership as a vacation property from Wyndham Vacation Resorts, Inc. located at Bonnet Creek Resort, 9560 Via Encinas, Orlando, Florida. On or about June 2, 2008, Upperman and Adcock transferred the equity in the Orlando timeshare to the purchase of a jointly financed timeshare property owned by Wyndham Vacation Resorts, Inc. called Grand Desert Resort located at 265 E. Harmon Ave., Las Vegas, Nevada to be used as a vacation property. On or about July 22, 2011, Upperman and Adcock jointly financed the purchase of a mobile home located on lot #129 within the Aspen Meadows mobile home park at 35648 Snowmass Run, N., Rehoboth Beach, Delaware. The mortgage documents for the purchase of this Delaware mobile home indicate the loan was granted for a non-owner occupied property. On the mortgage application, Adcock indicated it would be used as a second home and the box for primary residence was checked under Upperman's name. However, in a voluntary OIG interview with Upperman, he was asked why he and Adcock had purchased the mobile home and he stated, "It was supposed to be a vacation

home." On or about January 12, 2015, Upperman and Adcock jointly sold the Delaware mobile home and both received proceeds from the sale.

20. A review of bank statements and credit card records from 2012 through 2015 revealed that some of the utilities and other expenses associated with Adcock and Upperman's jointly owned Virginia condominium, Delaware beach house (including an approximately $350 monthly mortgage payment and approximately $604.10 monthly lot rent), and Nevada timeshare (including an approximately $1,332.93 monthly mortgage and approximately $493.93 monthly dues) were paid from their joint bank account, other joint expenses were paid by Adcock from his individual accounts (such as the mortgage on the Virginia condominium), and still other joint expenses were paid by Upperman from individual credit cards that received some payments from the joint bank account.

21. Debits and charges on Adcock and Upperman's respective bank debit and credit cards sometimes placed them in the same locations on the same dates from 2012 through 2015, including locations that were typically considered vacation destinations, such as Rehoboth Beach, Delaware; Orlando, Florida; Fort Lauderdale, Florida; and the islands of Hawaii. There were also multiple airline tickets purchased for Adcock and Upperman on Adcock's credit card.

22. DOE payroll records reveal Upperman and Adcock both had their paychecks deposited to Tower Federal Credit Union ("TFCU"). A review of subpoenaed records from TFCU revealed they had a joint bank account during at least the time frame of 2011 to 2015, and also possessed bank accounts separate from one another. A review of TFCU bank statements from 2011 to 2015 for the joint and separate bank accounts revealed some of the joint expenses for Adcock and Upperman – such as the property taxes, insurances, and utilities on their jointly owned condominium in Virginia and their jointly owned vacation homes – were paid on some occasions

from a TFCU account Adcock held separate from Upperman and some of these expenses were paid on some occasions from the joint TFCU account. There were also multiple transfers between the joint account and Adcock's and Upperman's respective separate accounts until at least 2015. The bank statements showed that Adcock's federal biweekly paycheck was deposited into a TFCU account he held separate from Upperman. Upperman's monthly military retirement and disability payments were deposited into the joint TFCU account, and his federal biweekly paycheck was deposited into the joint TFCU account while he was employed at DOD. When Upperman began DOE employment in approximately April 2014, his paycheck was deposited into an account he held separate from Adcock, and on or about the same date as the automatic payroll deposit there was an online banking transfer transaction of approximately the amount of the paycheck into the joint account.

23. Additionally, in your affiant's opinion, bank statements indicate both Adcock and Upperman had limited liquid assets and substantial credit card and loan debt by 2014. They appear to have sometimes borrowed money from banks or from each other to meet these debts. For example, on at least one occasion in approximately March 2013, Adcock made a transfer of approximately $3,550 from his separate TFCU account to their joint TFCU account, and then a payment was made a short time later of $3,650 on Upperman's personal credit card debt from the joint TFCU account.

24. Adcock also opened a TFCU personal loan account in approximately May 2012. Between the account opening date and the time that Upperman came to work for DOE in approximately April 2014, Adcock borrowed from the personal loan account approximately eight

times totaling approximately $28,166, and Adcock still had that loan pending at the approximate time of Upperman's DOE employment.

25. In your affiant's opinion, Adcock's and Upperman's financial documents obtained during the course of the investigation indicate that both of them would have had difficulty continuing to pay their debts and maintain their joint residence and jointly owned vacation homes if Upperman had lost his DOD job, which as discussed below, Adcock and Upperman had come to believe was a possibility by late 2013 when Adcock began taking steps to hire Upperman at DOE. In you affiant's opinion, Adcock's hiring of Upperman at DOE provided protection for Adcock's own personal finances by ensuring that Upperman could continue to help pay these joint expenses. Additionally, in your affiant's opinion, the hiring and eventual promotion of Upperman at DOE helped improve Adcock's personal finances by providing Upperman with more money that he could contribute to their joint expenses since the GS-15 salary Upperman obtained when promoted at DOE was higher than the GS-14 salary he had at DOD.

**C. <u>The Personal and Financial Relationship Between Adcock and Murphy</u>**

26. A review of Adcock's DOE work email account and other DOE records revealed information suggesting in your affiant's opinion that Adcock, Upperman, and Murphy were living together since at least 2012 at the Alexandria, Virginia condominium owned by Upperman and Adcock, and they moved from there in approximately December 2013 to the single family home in Fort Washington, Maryland purchased by Adcock. All three of them appear to have then resided at that Maryland address until at least 2015.

27. DOE records, financial and credit institution records, and statements made by Adcock in an interview in January 2015 with OIG suggest in your affiant's opinion that Adcock and Murphy had a close personal and financial relationship since at least approximately 2012. For

example, Adcock and Murphy applied for a joint credit card from TFCU on or about December 19, 2012, and they applied for an increase in the credit line of that credit card on or about June 17, 2013. There were multiple airline tickets purchased for Murphy on Adcock's personal credit card. On or about April 18, 2014, Adcock submitted a signed SF86 Questionnaire for National Security Positions to DOE, and on this form he reported Murphy was his current cohabitant and stated the cohabitation had begun July 25, 2012. In a January 2015 OIG interview, Adcock identified Murphy as his "other half." Additionally, Murphy reported his address on multiple documents, such as applications for lines of credit, a resume, personnel documents at his place of employment, and a driver's license, from approximately 2012 to 2015 as 181 E. Reed Ave., #214, Alexandria, Virginia, the condominium owned by Adcock and Upperman, and 8904 Nancy Lane, Fort Washington, Maryland, the home owned by Adcock.

**D. <u>Connection to the Subject Email Accounts</u>**

28. Adcock, Upperman, and Murphy used the Target Email Accounts in several situations. For example, a review of Adcock and Upperman's work email accounts revealed emails that were sent, forwarded, received, or copied to and from the following Target Email Accounts: don_adcock2002@yahoo.com, dupperman04@comcast.net, don.adcock@gmail.com, cody.murphy302@gmail.com, varehodc@gmail.com, and cmurphy42o@gmail.com. In credit and bank applications, Adcock provided his email as don_adcock2002@yahoo.com or don.adcock@gmail.com and Upperman provided his email as dupperman04@comcast.net. Joint credit applications completed by Adcock and Murphy listed their email addresses as don_adcock2002@yahoo.com and varehodc@gmail.com, respectively. Adcock's DOE email account contained a June 2013 email communication from TFCU regarding his joint credit with Murphy sent to Adcock at don_adcock2002@yahoo.com. His DOE email account also contained

a January 2014 email communication between Adcock and Murphy at cmurphy42o@gmail.com and varehodc@gmail.com regarding another joint credit account at GE Capital Retail Bank. Adcock's DOE email account contained emails from Google that revealed Adcock created the email account donald.adcock.doe@gmail.com in or about February 2014 and added his official government email account, donald.adcock@hq.doe.gov, to that newly created Google account.

## II. Criminal Violations

### A. Adcock's Personal Financial Conflict of Interest, in Violation of 18 U.S.C. § 208, in Hiring and Promoting Upperman

29. In an interview with OIG on January 29, 2015, Upperman stated that during calendar year 2013 his DOD organization, JIEDDO, was undergoing a reorganization and downsizing from 3,000 to 900 employees, and had employees sign a notice of possible mandatory relocation. Upperman further stated in the OIG interview, "The possibility was that, because you don't know. They're not telling anybody. They're making everybody sign this letter that says you might have to relocate somewhere else, you know, there's just too much uncertainty [regarding his continued JIEDDO employment]." Upperman explained this employment uncertainty was why he wanted to transfer to DOE. Additionally, Upperman experienced a reduction in pay between July 8, 2013 and September 30, 2013 when he was furloughed by DOD.

30. On or about January 27, 2013, Adcock was promoted to Deputy Chief Information Officer ("DCIO") at DOE. In an interview with OIG, the former Chief Information Officer ("CIO") at DOE, Robert Brese, said that as DCIO Adcock was "delegated as the hiring official" for positions that reported to the front office within the Office of the Chief Information Officer ("OCIO").

31. In or about early December 2013, the Chief Operating Officer ("COO") within the DOE OCIO front office announced his departure, which created an open GS-15 billet. Sonja

Green, Director of Human Capital and Administrative Management at OCIO, reported in an OIG interview that she had a meeting with Adcock in December 2013 concerning the open GS-15 billet. Adcock told her he wanted to "repurpose" the COO position into a newly-created GS-15 Executive Officer position that reported to him. She was asked to write a GS-15 position description ("PD") for the Executive Officer position.

32. On or about December 19, 2013, Adcock and Upperman discussed, using their DOE and DOD work email accounts, how to best get Upperman hired into the GS-15 position at DOE. Adcock informed Upperman that he had a meeting that afternoon to discuss the PD for the Executive Officer position and if the position was created as a GS-14/15 then Upperman would not be able to transfer into the position, but instead it would have to be competed and Upperman would have to submit an application. Adcock suggested, "I think it would be better to lateral you as a 14 and then in a year change the position to be a 15, do an internal only advertisement. What do you think?" Upperman responded, "The lateral will work best and be the easiest." Adcock replied, "I agree :-). We'll move forward that way then :-)."

33. On or about December 24, 2013, Green emailed Adcock at his work email account with a GS-15 PD for the Executive Officer position within the DOE OCIO and stated that "the attached draft Executive Officer PD is provided for your review/comment. The duties/language can be modified to complement the grade-level of the potential (GS-14) lateral candidate."

34. On or about January 13, 2014, Adcock sent a message from his work email account to Upperman's DOD email account stating that he intended to tell CIO Brese that he wanted him to meet Upperman in the next two weeks.

35. On or about January 17, 2014, Adcock requested and received the Executive Officer PD in an email from Green. On or about that same day, Adcock used his work email to

forward Green's email and the PD attachment to Upperman's DOD email account, told Upperman this was the PD that DOE would use to fill the Executive Officer position, and stated, "This should help you get your resume in order."

36. On or about February 4, 2014, Adcock emailed Green from his DOE email account and asked her to compare Upperman's resume to the PD she had written and suggest edits because "it needs to compliment the PD that you wrote." On or about that same date, Adcock sent an email from his DOE email account to Upperman at his DOD email account and told Upperman he had given Upperman's resume to Green to review and suggest edits. Additionally, Adcock told Upperman he would see him around 6:30 at "home."

37. On or about February 5, 2014, Adcock used his work email account to send Green an email containing a revised Upperman resume, and Adcock wrote the following: "Attached is a revised resume for Doug with the suggested changes you provided. Maybe one more look from you would be good before moving forward. Here are the next steps from my perspective. 1. Schedule time for CIO and Doug to meet … 2. Advertise to clear 'stopper list' … 3. Once they meet and we've cleared the stopper list,[3] then extend the 'offer' of the position to Doug and begin working the transfer from DoD to DOE. Not sure what you can do between now and my executing Step 1 above but I'd like to keep it moving while I work the meeting portion." On or about that same date, February 5, 2014, Green emailed Adcock at his DOE email account and stated, "I

[3] Based on the context of the email, your affiant believes that the "stopper list" that Adcock referred to is the announcement of a position opening required by the Interagency Career Transition Assistance Plan ("ICTAP"), which is discussed further in paragraph 41 of this affidavit.

revised the XO [Executive Officer] PD (attached) to reflect the GS-14 grade as well as to insert the supervisory duties/factors, per your direction."

38. On or about February 20, 2014, an Outlook calendar entry in Adcock's DOE email account and multiple emails between Adcock and Upperman on their work email accounts suggest in your affiant's opinion that a thirty minute meeting took place between Adcock, Upperman, and CIO Brese. On or about that same date, Upperman's resume and the Executive Officer PD were sent by the OCIO to DOE Human Capital with a request for determination of lateral transfer eligibility.

39. On or about February 28, 2014, Adcock signed the PD cover sheet authorizing the creation of the GS-14 Executive Officer position within the DOE OCIO and requesting the lateral transfer of Upperman. On or about that same date, Adcock sent an email from his DOE email account to Upperman's DOD email account informing Upperman that DOE Human Capital was still reviewing Upperman's paperwork and Adcock had "asked them to check and see if we can get it moving."

40. In or about March 2014, Adcock sent multiple emails from his work email account to Green inquiring about the status of the lateral transfer of Upperman to the Executive Officer position at DOE. Adcock then passed on the updates he received from Green in emails to Upperman sent over their work email accounts.

41. The Interagency Career Transition Assistance Plan ("ICTAP"), 5 CFR Part 330, Subpart G, required that before Upperman could be laterally transferred into the Executive Officer position, the position had to be advertised as an ICTAP announcement for certain federal employees in other agencies who have been involuntarily separated. Additionally, the Veterans Employment Opportunity Act ("VEOA") also allowed eligible veterans to apply to ICTAP

announcements before they were filled. On or about March 20, 2014, Adcock was notified by a DOE Human Capital Specialist that no ICTAP-eligible candidates had applied to the Executive Officer position, but federal employees that were veterans who were eligible under VEOA had applied. Adcock was given the list of qualified VEOA-eligible candidates, which he was required to review and either select a candidate from the list to fill the Executive Officer position or non-select everyone on the list. Adcock then non-selected the VEOA-eligible applicants and instructed Human Capital to proceed with the lateral transfer of Upperman.

42. Upperman began employment at the DOE OCIO as the GS-14 Executive Officer on or about April 20, 2014, and his first line supervisor was Adcock.

43. On or about October 16, 2014, Adcock served as the rater and reviewer for Upperman's 2014 final performance appraisal and gave him a performance rating of "Exceeded Expectations" and a corresponding cash award.

44. On or about July 25, 2014, Adcock emailed using his DOE email account an Outlook meeting invite for August 4, 2014 to Green and stated, "Sonja, I'd like to use this time to talk about the XO [Executive Officer] position and reshaping it." In an OIG interview, Green said she learned in that meeting that Adcock wanted to replace Upperman's GS-14 Executive Officer position with a GS-15 position called Chief of Staff to the DOE OCIO. According to Green, during the weeks that followed this meeting, her staff made her aware of information that suggested Adcock and Upperman had a personal relationship. Green explained that she wanted Adcock to be aware of the relationship rumor that was circulating in the OCIO and make sure he wanted to proceed with the hiring action to create the GS-15 position. Green said that when she asked Adcock about a possible personal relationship he had with Upperman, he told her he knew

Upperman from when they were both employed at DOD and to continue with the GS-15 hiring action.[4]

45. On or about August 15, 2014, Green sent Adcock on his work email account a draft PD for the Chief of Staff position. In an OIG interview, Green said Adcock initially asked her if they could advertise the Chief of Staff position as OCIO only, but she explained to him that advertising it nationwide throughout DOE was the narrowest area of consideration allowed.

46. On or about September 4, 2014, Adcock told Green to move forward with the staffing action for the Chief of Staff position. On or about September 5, 2014, Adcock became the Acting CIO upon the retirement of Brese. On or about September 8, 2014, the PD that would authorize the creation of the Chief of Staff position was given to Adcock's assistant for Adcock's signature. From on or about October 14, 2014 to November 4, 2014, the Chief of Staff vacancy announcement was posted and received multiple applicants. On or about December 18, 2014, Adcock electronically signed the selection certificate selecting Upperman for promotion to the GS-15 Chief of Staff position, which became effective in January 2015. Based on your affiant's review of the GS schedule for 2015, Upperman's salary increased from approximately $125,213 when he was a GS-14 Step 6 as the Executive Officer to approximately $134,662 when he became a GS-15 Step 3 as the Chief of Staff.

47. Accordingly, in your affiant's opinion based on the investigation to date, from December 2013 to December 2014 Adcock took steps in his official capacity at DOE that made

---

[4] Robert Brese, the DOE CIO at the time of Upperman's hiring to DOE, reported in an OIG interview that Adcock recommended Upperman for the Executive Officer position at DOE in 2014, but did not disclose that he knew Upperman on a personal level until after Upperman's transfer was "put into motion." Additionally, Brese said when Adcock later disclosed that he had a "previous relationship" with Upperman, Adcock told him that the relationship was over and they had not been living together in more than a year.

him directly responsible for the lateral transfer and subsequent promotion of Upperman at DOE. During this same time frame, in your affiant's opinion based on the investigation to date, Adcock's DOE email account, bank and credit institution records, records from DOE, and other records reveal that Adcock and Upperman had a close personal and interconnected financial relationship, including living at the same residences, holding a joint bank account, and incurring and managing multiple joint financial obligations. For example, in this time frame, their joint TFCU account was used to pay loan and other expenses associated with their jointly owned Delaware home, their jointly owned Nevada timeshare, and utilities at the Maryland home solely owned by Adcock (after it was purchased by Adcock in December 2013). In this time frame, Adcock also periodically transferred money from a TFCU account he held separate from Upperman into their joint TFCU account, but consistently the largest portion of money deposited or transferred into the joint account came from Upperman's federal paycheck. Financial records reveal that during this same time frame, Adcock and Upperman both had substantial credit card debts, loan debts, and minimal liquid assets.

48. In your affiant's opinion based on the investigation to date, when Adcock created a GS-14 position for Upperman at DOE that could be converted to a GS-15 position, and later was, Adcock ensured the protection of his own personal financial interests – a part of which included all the joint assets and debts held with Upperman. Additionally, when Adcock created a GS-14 job for Upperman at DOE that could later be turned into a GS-15 job, and then promoted Upperman into that GS-15 position, Adcock ensured that Upperman obtained a pay raise that provided more money for the payment of their numerous joint expenses. Furthermore, in your affiant's opinion based on the investigation to date, if Upperman had lost his job at DOD due to the expected downsizing of JIEDDO, or incurred further DOD furloughs, it is unlikely that Adcock would have

been able to alone pay, without incurring substantial further personal debts, the mortgage on his Maryland residence shared with Upperman (and Murphy), the mortgage on the Delaware vacation home jointly owned with Upperman, the mortgage and fees for the Nevada timeshare jointly owned with Upperman, the associated expenses for these ownership interests, and Adcock's own personal debts.

49. Your affiant submits that based on Adcock and Upperman's close personal and interconnected financial relationship, there is probable cause to believe that Adcock participated substantially and personally in a matter affecting Adcock's personal financial interest, in violation of 18 U.S.C. § 208, by hiring and promoting Upperman. Furthermore, there is also probable cause to believe that additional evidence of this crime can be found in a search of the three Target Email accounts don_adcock2002@yahoo.com, don.adcock@gmail.com, dupperman04@comcast.net. During the time frame from December 2013 to December 2014 when Adcock was hiring and promoting Upperman at DOE, Adcock and Upperman used their government work email accounts to exchange emails regarding joint financial matters, such as mortgages, property sales, groceries, house service calls, bill statements, and bank account money transfers. Many of these emails sent or received on their work email accounts were also copied, forwarded, or sent in response to emails originally sent using the Target Email Accounts don.adcock@gmail.com and dupperman04@comcast.net. For example, on or about October 29, 2013, an email concerning the sale of their Alexandria condominium was sent to don.adcock@gmail.com and dupperman04@comcast.net. On or about April 9, 2014, Adcock used his work email to send Upperman an email at dupperman04@comcast.net regarding an appointment for a plumber to come to the Maryland house. On or about November 17, 2014, Upperman sent Adcock a mortgage statement for the Maryland house from the email account dupperman04@comcast.net. On or

about November 3, 2014, Upperman sent Adcock his resume from the email account dupperman04@comcast.net. In addition to using work email accounts to communicate with these personal email accounts, a review of TFCU records and Adcock's DOE email account revealed Adcock provided his email address as don_adcock2002@yahoo.com and Upperman provided his email address as dupperman04@comcast.net in credit union membership applications sent to TFCU. Additionally, in various credit card and loan applications, Adcock provided his email as don_adcock2002@yahoo.com or don.adcock@gmail.com and Upperman provided his email as dupperman04@comcast.net. Therefore, there is probable cause to believe additional evidence of Adcock and Upperman's joint financial relationship and the steps that Adcock took to further his own personal financial interest by hiring and promoting Upperman may be found in these three Target email accounts given Adcock and Upperman's use of and designation of them for personal and financial communications.

**B. False Statements, in Violation of 18 U.S.C. § 1001, by Adcock and Upperman Regarding Their Financial Relationship**

50. On January 29, 2015, your affiant separately interviewed Adcock and Upperman. Both interviews were recorded and provided voluntarily. Despite Adcock and Upperman reading, reviewing, and executing forms prior to their interviews warning them that making false and misleading statements could be a violation of 18 U.S.C. § 1001, in your affiant's opinion based on the investigation to date, both of them gave false and misleading answers to questions about the nature and extent of their financial relationship.

**i. Adcock's Interview**

51. Adcock was asked, "Have you ever had a financial connection with Mr. Upperman?" He replied, "Ever, in my whole life? Yes, at one time we owned a condominium together in Alexandria. We sold that, uh, four years ago. No, no, no, um, three years ago I think

maybe." Adcock was asked, "So when did you sell the condo?" He responded, "About I think it was three years ago. Two years ago. Three, two to three years ago. I've been down there, no, no, no because I sold it when I moved down there [Maryland] so I moved down there in November, December of 13 and I sold the condo just before that."[5] Adcock also said, "I lived there [at the Virginia condominium] the last, just before I sold it and stuff like that, I lived there by myself. Uh, Doug has a place in Delaware, uh, that he moved to shortly after he stopped living there, and uh on, after that I mean I sold the place. The place, uh, was in both of our names. The place in Maryland I bought outright on my own and moved to Maryland." Adcock was asked, "So, he [Upperman] moved out [of the Virginia condominium] in 2012?" and he said, "Yea. He stopped staying on a regular basis and paying mortgages and rents and things like that sometime in 2000, early 2012, uh maybe late 2011, but I would say more 2012."

52. Adcock was later asked, "He [Upperman] doesn't ever stay with you at your Fort Washington house?" He replied, "Yes, sometimes he will call and say hey I'm late or I've got to be in super early, do you mind if I stay there for the night. And I don't care." Adcock was asked, "Mr. Upperman stays there [Maryland house] occasionally?" He replied, "Off and on." Adcock was then asked, in reference to the expenses at the Maryland home, "So the mortgage on the Fort Washington house?" He responded, "100% me. Everything is 100% me. It's my home. I'm the only person on the deed. I'm the only person that pays the mortgage. None of the individuals that

---

5 As Adcock ultimately admitted, the condominium he and Upperman owned together in Alexandria, Virginia was sold in December 2013.

stay with me pay me money, rent, or anything for any of the time that they stay there, and they are all responsible for anything that they do, for food or whatever, that's on them."

53. In your affiant's opinion based on the investigation to date, these statements were false and misleading for numerous reasons discussed throughout this affidavit. For example, emails from government email accounts, financial records, and other information indicate that Upperman lived with Adcock in the Virginia condominium more recently than 2012, and that Upperman (and Murphy) moved into the home in Maryland that Adcock purchased in December 2013. Indeed, in an SF86 Questionnaire for National Security Positions submitted by Upperman to DOE in 2014, he wrote that he lived during the workweek at the Alexandria condominium until he sold it in 2013 and currently resided during the workweek at Adcock's house in Maryland. Additionally, as of the approximate date of the January 2015 OIG interview with Adcock, TFCU bank records reveal various utilities at the Maryland house were being paid from Adcock and Upperman's joint account. During the 2013 to 2015 time frame (and even earlier, going back to 2011), there were multiple money transfers between the joint account and other TFCU accounts Adcock and Upperman held separately, which indicates that both of them were responsible for paying utilities at their Maryland residence. Upperman's federal paycheck while employed at DOD, for example, was deposited into the joint account held with Adcock. After Upperman began employment at DOE, his federal paycheck was deposited into an account he held separate from Adcock, and on or about the same date as the payroll automatic deposit there was an online banking transfer of approximately the paycheck into the joint account held with Adcock.

54. In your affiant's opinion based on the investigation to date, Adcock also provided false and misleading answers to questions regarding the payments on the Delaware vacation home he jointly owned with Upperman. Adcock was asked, "When he [Upperman] moved out and he

moved to Delaware as you mentioned, is he staying at the beach house that you both own?" He replied, "Mmm hmm. Uh, he was, yea, at the time. But again I had stopped paying that. We sort of decided how we would split proceeds and stuff like that and so I wasn't paying anything to that [Delaware property]. As a matter of fact, I haven't paid anything on that in many years." TFCU monthly bank statements reveal the mortgage and lot rent payments for the Delaware home were debited from an account Adcock separately held until approximately September 2012 when both payments began to be debited from Adcock and Upperman's joint account.[6]

55. In your affiant's opinion based on the investigation to date, Adcock also made false and misleading statements regarding the ownership, mortgage payments, and use of the Nevada timeshare jointly owned solely with Upperman. Adcock was asked, "Do you have any other personal relationships, uh, with Mr. Upperman meaning do you own any other property or have you owned any other property with Mr. Upperman - any other financial investments with Mr. Upperman?" He responded, "No ma'am not that I'm aware." Your affiant began to confirm the property he owned by asking, "So, the only property that you --" when Adcock interrupted and said, "Had used to own is the condo and the beach house. Yea." When then asked, "You never owned any property in Nevada?" he responded by repeating the question, "Nevada?" When it was clear that your affiant already knew about the timeshare by specifically asking "Las Vegas timeshare perhaps?" he admitted, "Ahh, okay. I did own a timeshare. Yea. But that was

---

[6] Adcock refused to provide clear information about the date of the sale of the jointly owned Delaware vacation home. Adcock was asked, "Did you own property with Mr. Upperman in Delaware?" He responded, "Uh, for a time period we owned a property in Delaware as well as, uh, sort of a rental, a beach house type of thing, but I don't own that property anymore. That property has since been sold." When asked, "When was that?" he stated, "Last year I think it was." The Delaware property had only been sold approximately seventeen days prior to the OIG interview.

something that we did with his [Upperman], with his wife, uh, ex-wife. We had made an investment. Yea. But that's all his property now. That's not anything with mine."

56. Your affiant then confirmed with Adcock that his and Upperman's names were both on the Alexandria condominium deed and the Delaware deed, but when asked "And both of your names were on the deed for the timeshare in Las Vegas?" he again replied, "Yes ma'am, but we also owned that with a third person as an investment property." Your affiant confirmed the identity of the alleged "third person" by asking, "Uh, his ex-wife Andrea?" Adcock answered, "Yes. Boy, you've done your homework." Adcock was asked, "And you were on the timeshare deed. The Vegas timeshare deed. Have you sold that and come off the deed or are you still on the deed?" He replied, "Trying to do that, but it is very difficult to do. To come off of a timeshare deed. Um, so that was something that we had looked into, but the way that works is Doug takes care of that. Like I don't know how much he pays for those things. I don't know how much he, um, like the mortgage and stuff like that. I don't do that and I haven't done that in 5 to 7 years or something. I mean it's been a long time. I've – I don't pay those bills or anything. That's sort of his and his ex-wife's if you will."[7]

57. TFCU monthly bank statements reveal the mortgage and monthly membership dues for the Nevada timeshare were debited from Adcock and Upperman's joint account. Additionally,

---

[7] About two-thirds of the way through the OIG interview, Adcock was asked again, "I know I asked you this before, but that was before we remembered about the Las Vegas timeshare. Were there any other financial, joint financial accounts or anything that you and Mr. Upperman had in the past and/or now?" He responded, "No. But the timeshare though. The timeshare is, um, I don't know if you are familiar with how timeshares work, but we bought, uh, the timeshare jointly. And I think there's, it's spread over three, but I don't think Las Vegas Nevada is even one of them anymore. I think it's Hawaii. Uh, maybe it is. Uh, it's either Hawaii and Orlando or Hawaii and Las Vegas that make up that package. Um, but again I don't get involved in it. Doug pays for all of that. He carries it. Um, mine and his ex-wife's name are on the deed, but she doesn't also contribute financially to that. Uh, at all. Um, and I have. I mean I guess legally I would have to do something if they said, you know, you have to do something as far as an assessment or

a review of sale and loan documents for the Nevada timeshare obtained from Wyndham Vacation Resort, Inc. reveal the property was initially bought jointly by Upperman and Adcock, is presently owned jointly by Upperman and Adcock, and Upperman's ex-wife never had a financial interest in the property.[8] Additionally, Andrea Luque, Upperman's ex-wife, told OIG in an interview conducted in October 2016 that she and Upperman bought a Hawaii timeshare when they were married that had since been paid off, but she never owned a Nevada timeshare.

58. Adcock and Upperman's ownership interest in the Las Vegas, Nevada property, their "home resort," was assigned points, which were symbolic and enabled them to reserve occupancy at their home resort or any other Wyndham Plus resort. When Adcock was asked, "So you haven't been to the Las Vegas timeshare?" he said, "Not in a long time that I can remember." He was then asked, "So you remain on the deed to the timeshare, but you're saying you pay nothing towards the mortgage?" Adcock responded, "That is correct. I don't pay anything towards the mortgage or anything. I don't have any financial dealings with, with the timeshare whatsoever.

---

something like that, but Doug carries that mortgage and has for many, many, many years. Almost from the day that we bought it. I don't think I've ever paid for it, just went on the deed."

[8] More specifically, documents obtained from Wyndham Vacation Ownership reveal Upperman and his ex-wife obtained a mortgage and deed on or about April 20, 2004 for a Hawaii timeshare property. On or about February 27, 2007, Upperman solely obtained a mortgage and deed for another Hawaii timeshare property. Upperman and Adcock transferred the equity from the Hawaii timeshare owned by Upperman and received a joint mortgage and deed on or about November 26, 2007 for a timeshare property in Orlando, Florida, and then transferred the Florida equity to receive a joint mortgage and deed on or about June 2, 2008 for a timeshare property in Las Vegas, Nevada. Upperman's ex-wife was not listed on the mortgages or deeds for the Florida or Nevada timeshares jointly owned by Adcock and Upperman.

And presently have no financial dealings and haven't for many years with, with Mr. Upperman on any of the properties."

59. There are multiple instances from 2012 through 2015 where emails or Adcock's bank and credit card statements indicate he was using his timeshare ownership to stay at various Wyndham timeshare properties. For example, Adcock's TFCU bank statements indicate multiple ATM transactions and a point of sale transaction at the Nevada timeshare as recently as approximately six months prior to the OIG interview. Adcock's credit card statements indicate multiple charges at the Nevada timeshare in approximately June 2013 for reservation dates listed as June 20, 2013 to June 26, 2013. In Adcock's DOE email account there was an email to Upperman sent on or about February 27, 2013 in which Adcock described the accommodations he had reserved at a Wyndham timeshare property in Hawaii for their March 2013 stay and told Upperman they had 409,000 points left for the year. Adcock's credit card statements indicate multiple charges at a Hawaii timeshare in approximately March 2013 as well as Hawaiian Airlines charges for Adcock, Upperman, and Murphy. Adcock's credit card statements indicate charges at a Florida Wyndham timeshare property on or about January 24, 2013 to January 28, 2013. Adcock's credit card statements indicate charges by a Wyndham Royal Garden timeshare in Hawaii in approximately April and June 2015, which suggests he may have continued to use his timeshare ownership even after the OIG interview.[9]

**ii. <u>Upperman's Interview</u>**

60. Towards the beginning of Upperman's interview with the OIG, he was asked "Do you have any other or did you have any other financial properties or accounts or anything with Mr.

[9] In addition to Adcock making false and misleading statements regarding his financial relationship with Upperman in his OIG interview, Adcock also gave evolving answers regarding the nature of his personal relationship with Upperman. As discussed further throughout this

Adcock?" Upperman replied, "I am not on any of his accounts. I mean he has his own bank accounts. I have my own bank accounts." Upperman was asked, "So when you lived together in the condo, you did not have joint accounts?" Upperman responded, "No ma'am we never had joint accounts."

61. After discussing the ethics training Upperman received at DOE, he was asked whether he had consulted with the DOE ethics official about the lateral transfer, promotion, and living at Adcock's Maryland house, "Even though you knew Mr. Adcock in a very personal relationship in the past and you were currently staying with him from time to time?" Upperman said, "I didn't see that as an issue. I mean I don't give him any money. There's no money exchanged. I just stay there." He was further asked, "Did you talk with Mr. Adcock, either in a supervisory position or a personal off-line position, um, about any ethics conflicts. Did it ever come up?" Upperman responded, "I didn't. No ma'am because I didn't see it as an ethical conflict 'cause I'm not providing him [Adcock] any livelihood or anything like that. I have my own money. He has his own money. I do what I do and he does what he does." Upperman was then asked,

---

affidavit, in your affiant's opinion the evidence gathered during the course of the investigation suggests a close personal relationship existed between Adcock and Upperman for years and that Upperman was living at Adcock's Maryland house at the time he was hired by DOE in April 2014 and at the time of the OIG interview in January 2015. Indeed, emails suggest Adcock, Upperman, and Murphy hosted a Christmas party at their Maryland house approximately a month before the OIG interview. On the other hand, Adcock stated in his OIG interview that Upperman was only a "friend," then a "good friend," and ultimately that they had previously been in a relationship as a couple that had since ended, and Upperman was more of a "work acquaintance" today. Adcock said, "I don't go out with [Upperman]. I don't go out on the weekends with him or things like that … On the personal level I see him a couple of times a month or so. I mean I don't do, I don't go out with him. I don't socialize in a social setting outside of work with him. Like we don't go partying or drinking or to the movies or things like that, but I do see him outside of work. I mean we'll occasionally attend happy hours or you know. He's been to the house before too, with friends, with other friends and things like that." After further questioning on the topic, Adcock stated he might see Upperman outside of work one or two times per week, but that it was not consistent.

"So neither one of you, you or Mr. Adcock, expressed any concerns about it being unethical?" and he replied, "No. I didn't. No ma'am. I don't believe that it is an ethical matter from my standpoint because I don't give him any money and he doesn't benefit from the money that I get because it all goes into my bank account and I do with it what I want."

62. In your affiant's opinion based on the investigation to date, these statements were false. As discussed throughout this affidavit, bank records from TFCU reveal that Adcock and Upperman had a joint bank account at the time of the January 2015 OIG interviews and possessed that account at least as far back as 2011. Additionally, as discussed previously, when Upperman began employment at DOE, he had his federal paycheck deposited into an account he held separate from Adcock, but on or about the same date as the automatic deposit there was an online banking transfer of approximately the amount of the paycheck into the joint account.

63. Upperman also made what appear, based on the investigation to date, to be false and misleading statements regarding the Delaware vacation home and the Nevada timeshare owned jointly with Adcock. In reference to the Delaware property, when Upperman was asked, "So it was owned by you and -- ," he interrupted and said, "Yes, but he [Adcock] paid none of the bills at that house. I paid 100% of the bills at that house." Upperman was then asked, "Did you own any other property?" He responded, "I own a timeshare that his name is on the deed for, but he doesn't, like I said he doesn't pay that bill either 'cause my ex-wife owns it as well." Your affiant confirmed by asking, "So you, your ex-wife, and Mr. Adcock are on the deed of a timeshare?" and Upperman said, "Yes ma'am." As discussed above, Upperman's ex-wife was not listed on the mortgages or deeds for the Florida or Nevada timeshares jointly owned by Adcock and Upperman and TFCU monthly bank statements reveal the mortgage and monthly membership dues for the Nevada timeshare were debited from Adcock and Upperman's joint account.

Additionally, TFCU monthly bank statements reveal the mortgage and lot rent payments for the Delaware home were debited from an account Adcock separately held until approximately September 2012 when both payments began to be debited from Adcock and Upperman's joint account.

64. Your affiant submits that based on evidence gathered during the course of the investigation from various sources as described herein, there is probable cause to believe that Adcock and Upperman made false and misleading statements, in violation of 18 U.S.C. § 1001, regarding their financial relationship with one another during their interviews with OIG in January 2015. Furthermore, given Adcock and Upperman's use and designation of the three Target Email Accounts don_adcock2002@yahoo.com, don.adcock@gmail.com, and dupperman04@comcast.net for personal and financial communications, as discussed above, there is also probable cause to believe a search of those accounts may reveal additional evidence of Adcock and Upperman's interconnected finances, which will further demonstrate the false and misleading nature of Adcock and Upperman's statements to OIG.

**C. Adcock's False Statements in Mortgage Loan Applications (Including Veterans Administration Loan Applications), in Violation of 18 U.S.C. § 1001, 18 U.S.C. § 1014, 18 U.S.C. § 1343**

65. On or about October 10, 2012 and October 26, 2012, Adcock signed a Uniform Residential Loan Application that was submitted to McLean Mortgage Corporation to refinance the mortgage loan for the condominium he jointly owned with Upperman located at 181 E. Reed Ave., #214, Alexandria, Virginia. Adcock acknowledged the information provided in the application was "true and correct" and that any intentional or negligent misrepresentation of the information might result in criminal penalties. The existing first and second mortgages on the condominium property were reported as monthly housing expenses. These same mortgages were

reported in the "Assets and Liabilities" section of the application. Along with the additional liabilities of a Discover credit card account jointly held with another person named Thurman Harter,[10] a TFCU personal loan, and a Barclays Bank credit card account. There was also a section in the application that specifically asked for the "Schedule of Real Estate Owned." In this section, the condominium located at 181 E. Reed Ave., #214, Alexandria, Virginia was the only property listed. In an additional section titled "Declarations," the applicant was asked, "Have you had an ownership interest in a property in the last three years?" The "Yes" box was checked as well as boxes indicating the property was a primary residence jointly owned with another person.[11] The joint loans held by Adcock and Upperman to finance the purchase of the Delaware vacation home and the Nevada timeshare were not reported in the mortgage loan application.

66. On or about October 9, 2013, Adcock signed a Uniform Residential Loan Application that was submitted to DHI Mortgage Company to obtain a mortgage loan guaranteed by the U.S. Department of Veterans Affairs ("VA") to purchase a solely owned single family residence located at 8904 Nancy Lane, Fort Washington, Maryland. Adcock acknowledged with his signature the information provided in the application was "true and correct" and that any intentional or negligent misrepresentation of the information might result in criminal penalties. In the "Assets and Liabilities" section of the application, the first and second mortgage on the jointly

---

10 In addition to holding a joint Discover credit card account with Harter, Adcock also held a TFCU bank account with him. The mortgage loan file contains letters from Harter stating that the Discover credit card debt all belonged to Harter, Harter was making all the payments on the credit card debt, and Harter had no ownership of the funds contained in the TFCU account. A search of databases available to your affiant revealed that Harter and Adcock shared a common address years ago, but the full nature of their relationship is not yet known.

11 Based on the format and context of the document, in your affiant's opinion, these answers in the "Declarations" section were a reference to the Virginia condominium owned jointly by Adcock and Upperman as their primary residence until December 2013.

owned Alexandria condominium were listed along with an auto loan from BMW Financial Services, a Discover credit card account jointly held with Thurman Harter, a TFCU personal loan, a Barclay's Bank credit card account, and a TFCU credit card account jointly held with Murphy. In a section of the application that specifically asked for the "Schedule of Real Estate Owned," nothing was listed. In an additional section of the application titled "Declarations," it asked, "Have you had an ownership interest in a property in the last three years?" The "Yes" box was checked as well as boxes indicating the property was a primary residence jointly owned with another person.[12] The joint loans held by Adcock and Upperman for the purchase of the Delaware home and the Nevada timeshare were not reported in the mortgage loan application.

67. On or about December 13, 2013, Adcock signed a second Uniform Residential Loan Application that was submitted to DHI Mortgage Company to obtain a mortgage loan guaranteed by the VA to purchase a solely owned single family residence located at 8904 Nancy Lane, Fort Washington, Maryland. Adcock with his signature again acknowledged the information provided in the application was "true and correct" and that any intentional or negligent misrepresentation of the information might result in criminal penalties. In the "Assets and Liabilities" section of the application, the first and second mortgage on the jointly owned Alexandria condominium was listed along with an auto loan from BMW Financial Services, a Discover credit card account jointly held with Thurman Harter, a TFCU personal loan, a Barclay's Bank credit card account, and a TFCU credit card account jointly held with Murphy. In a section of the application that specifically asked for the "Schedule of Real Estate Owned," the

[12] Based on the format and context of the document, in your affiant's opinion, these answers in the "Declarations" section were a reference to the Virginia condominium owned jointly by Adcock and Upperman as their primary residence until December 2013.

condominium located at 181 E. Reed Ave., #214, Alexandria, Virginia was the only property listed. In an additional section titled "Declarations," the applicant was asked, "Have you had an ownership interest in a property in the last three years?" The "Yes" box was checked as well as boxes indicating the property was a primary residence jointly owned with another person.[13] The joint loans held by Adcock and Upperman for the purchase of the Delaware home and the Nevada timeshare were not reported in the mortgage loan application.

68. Additional documents included in the loan application packet for the purchase of the property located at 8904 Nancy Lane, Fort Washington, Maryland included a document signed by Donald Adcock on or about October 9, 2013 that stated, "It is illegal for a person to make any false statement regarding income, assets, debt, or matters of identification, or to willfully overvalue any land or property, in a loan and credit application for the purpose of influencing in any way the action of a financial institution." This signed document also listed multiple federal criminal statutes that could be charged in connection with mortgage fraud, including 18 U.S.C. § 1001, 18 U.S.C. § 1014, and 18 U.S.C. § 1343. Also on or about that same date, October 9, 2013, Adcock signed a "Borrower's Certification & Authorization" certification that stated he understood that it was a federal crime punishable by fine or imprisonment, or both, under 18 U.S.C. § 1014 to knowingly make any false statements when applying for the mortgage. On or about that same date, October 9, 2013, and on or about October 23, 2013, Adcock signed another document titled "Notice to Borrowers: Undisclosed Debts and Obligations" that informed borrowers it was "extremely important" to disclose all open or pending debts or obligations. Finally on or about December 13, 2013, Adcock signed a document titled "NOTICE TO BORROWERS and

13 Based on the format and context of the document, in your affiant's opinion, these answers in the "Declarations" section were a reference to the Virginia condominium owned jointly by Adcock and Upperman as their primary residence until December 2013.

Certification (PLEASE READ CAREFULLY): Undisclosed Debts or Obligations." This document stated, "Before signing the certification below, please review the Liabilities listed in Section VI of the Uniform Residential Loan Application to make certain that the list is an accurate reflection of any existing or pending accounts/balances … and … includes any credit you have received or any credit you have co-signed for …." Adcock signed the certification that the liabilities listed in the loan application were "accurate and complete" and acknowledged that any intentional or negligent misrepresentation of the liabilities might result in criminal penalties.

69. VA form 26-6393 titled "Loan Analysis" is the form used by the underwriter to certify that he/she has reviewed and approved the loan. That form lists the borrower's personal and financial status, including a list of debts and obligations that are used by the underwriter to make their loan approval decision. The loans received for the Delaware and Nevada properties were not listed on the VA form 26-6393 completed for Adcock's loan application and do not appear to have been known to the underwriter or considered in the VA guaranteed loan approval decision.

70. Despite the instructions and warnings provided with the various loan documents, Adcock did not list the joint loans he held with Upperman for the purchase of the Delaware vacation home and the Nevada timeshare in any of his mortgage loan application documents. Accordingly, your affiant submits there is probable cause to believe that in failing to provide the mortgage lenders, including the VA, with information about his full debts, Adcock committed violations of 18 U.S.C. § 1001 (false or misleading statements to a government agency), 18 U.S.C. § 1014 (mortgage fraud), and 18 U.S.C. § 1343 (wire fraud). Additionally, a review of Donald Adcock's DOE email account revealed he was using the email account don.adcock@gmail.com to communicate with mortgage lenders. For example, on or about October 17, 2013, an employee

of DHI mortgage sent Adcock an email at don.adcock@gmail.com requesting additional documents for the pending "credit approval decision." On or about January 29, 2015, an employee of Wells Fargo Home Mortgage sent Adcock an email at don.adcock@gmail.com requesting Adcock sign VA loan documents and email back. Therefore, your affiant submits there is probable cause to believe a search of the email account don.adcock@gmail.com may reveal additional documentary evidence regarding false statements made during the loan transactions. Furthermore, given that don_adcock2002@yahoo.com and dupperman04@comcast.net were also used for communications between Adcock and Upperman regarding their joint finances, as well as with their financial institutions, as discussed above, your affiant submits there is also probable cause to search those accounts for evidence of Adcock's false statements made during the loan transactions.

### D. Extortion Under Color of Official Right, in Violation of 18 U.S.C. § 1951, in Murphy's Hiring at ActioNet

71. For several years, ActioNet has been the prime IT contractor for DOE. In a 2016 OIG interview, Michael Genebach, Senior Vice President at ActioNet and the head of the Energy Business Unit, which manages the DOE contract, said the DOE contract was the largest contract ActioNet held and the only contract for the Energy Business Unit. The contract began on or about April 2012 and consisted of a two year base that expired in approximately April 2014, a possible two year option that was exercised in approximately April 2014 and expired in approximately April 2016, and a possible one year extension that was exercised in approximately April 2016 and was tentatively set to expire in approximately April 2017. In or about September 2016, the contract was worth more than approximately $775 million.

72. A review of DOE email accounts revealed emails between Adcock and Brese discussing their unhappiness with ActioNet as the IT contractor beginning as early as 2012, the year the contract was awarded. For example, on or about December 26, 2012, Brese and Adcock

had an email conversation in which Adcock wrote, “Mike [Genebach] has been talking a lot about ‘work’ and I’ve heard rumor they are irritated and thing [sic] we are taking work away with our outsourcing initiatives.” Brese replied back, “They need to go.” Adcock then replied, “Re-compete for sure.” On or about January 10, 2013, Brese emailed Adcock and Sarah Gamage, DOE Associate Chief Information Officer (“ACIO”), and asked them to draft an internal OCIO memo to have “all Actionet [sic] tasks reviewed and re-written with measurable outcomes and metrics.”

73. In early 2013, there were also multiple emails sent or received on DOE email accounts between Brese, Adcock, Genebach, and others regarding issues with the quality of ActioNet’s IT support to DOE. For example, several of the IT issues revolved around top level DOE executives repeatedly not being able to gain access to the DOE network, a problem that emails revealed lasted for over a year, or not receiving requested equipment or services in a timely manner. These issues resulted in high level DOE executives going directly to Brese and Adcock on multiple occasions with their issues. Other emails involving Adcock, Brese, Genebach and others appeared to express the OCIO’s unhappiness with ActioNet’s performance in response to DOE data breaches in 2013 and ActioNet’s troubles with a migration to the Windows 7 operating system.

74. On or about October 2, 2013, Gamage sent Adcock’s DOE account an email titled “Updated Discussion list.” The first item on the list was the re-competition of the ActioNet contract. On or about October 21, 2013, Adcock sent an email from his work email account to Gamage and three other OCIO managers titled “URGENT ACTION: Recompete.” The text of the

email began, "As we've discussed the recomplete [sic] of the ActioNet contract is critical to our successful future."

75. On or about December 19, 2013, Brese sent an email to Genebach with a cc to Adcock and ACIOs Virginia Arreguin and Gamage in which Brese wrote: "We continue to have problems with the most basic aspects if [sic] IT operations with your team. I have to say I have little to no confidence in the technical competence of ActioNet. I assure you, I am exploring other options to obtain the technical advice and service DOE needs to be successful." Adcock forwarded Brese's email to Gamage and asked, "Is this good enough as our first 'poor performance' email for the file?? If not let me know what is needed." Continuing on that same date, December 19, 2013, Adcock sent a follow-up email to Gamage telling her Brese wanted to see her as soon as she was in the building and giving her notice that Brese was "completely irate" and had "already called for two of the contractors to be fired immediately."

76. On or about February 19, 2014, Adcock sent an email from his DOE email account to Gamage with a cc to Brese asking when the "timeline and Acquisition Strategy" for the ActioNet recompete would be complete. On or about March 18, 2014, Adcock sent an email to one of the OCIO staff instructing her to block off ten to fifteen minutes at the beginning of every weekly staff meeting so Gamage could "update us on where we are with regard to the Contract Re-compete." In approximately mid-March 2014, Brese and Adcock had an email exchange in which Brese expressed his dissatisfaction with the percentage of DOE assets ActioNet still had remaining for

the Windows 7 migration, and told Adcock he could not report those numbers to the Secretary of Energy "without a list of the people terminated."

77. During an OIG interview with Genebach conducted on February 17, 2016, he said he did not recall receiving the above mentioned emails, but did remember "Bob [Brese] being unhappy" and meeting with Adcock.

78. Despite Adcock and CIO Brese's interest in recompeting the ActioNet contract, which they expressed in emails as early as December 2012, DOE ultimately agreed in approximately April 2014 to exercise the two year option to continue the contract until approximately April 2016. Although Adcock was not the final signatory on the ActioNet contract option in April 2014, DOE emails suggest that he met with ActioNet executives regarding the contract and relayed the content of those discussions to Brese during the time frame of early 2014. For example, on or about January 24, 2014, Adcock sent an email to Arreguin and Genebach to schedule a meeting whose subject was "Way Forward Discussion." In the email, Adcock wrote that he wanted to discuss "personnel, and assessment, and action plan." On or about February 26, 2014, Adcock emailed Brese that he had a good meeting with Arreguin and Genebach. On or about March 14, 2014, Ashley Chen, the President of ActioNet, emailed Adcock thanking him for a meeting and included a table in the email that outlined ActioNet's "action items," all of which were assigned to Genebach. Adcock returned her email and stated, "Thanks for being committed to the improvements we discussed and staying focused on making forward progress." Adcock also said he would have his assistant schedule his visit to ActioNet's headquarters as they had discussed.

79. During the time frame in January to April 2014, when the option to continue ActioNet's contract was ultimately exercised, Adcock also had communications with Genebach in

which Adcock referred Cody Murphy to Genebach for a job at ActioNet and encouraged Genebach to hire him. Ultimately, Murphy was hired by ActioNet for a job as a "Technical Writer" in February 2014 and began work a month later.

80. As discussed further below, evidence gathered during the course of the investigation reveals several abnormalities regarding Murphy's hiring. For example, Genebach was directly involved in parts of the ActioNet hiring process for Murphy in a manner that appears to have been unusual for him to take for such a relatively low-level hire, and he assigned Purshina Patel to act as the hiring manager for Murphy's position even though she was not normally involved in such hires. Additionally, Murphy's work as a bartender and his other employment and educational history, including his lack of a college degree, do not appear to have given him the qualifications for a Technical Writer position based on ActioNet's normal job description for that position.[14] There is not even a labor category for directly billed positions under ActioNet's DOE contract that permits a person to be hired without a college degree, yet Murphy was hired and directly billed to the DOE contract. Furthermore, all DOE work orders on the ActioNet contract

---

[14] Through ActioNet's Internet website your affiant has obtained a PD ActioNet posted in 2015 for a Technical Writer position at DOE. The job responsibilities described in the PD were commensurate with those listed within the contract for a Technical Writer position, including explaining scientific and technical ideas in simple language and creating how-to-guides and instruction manuals. Additionally, the vacancy announcement required a college degree, two to four years of experience, and a security clearance.

The Technical Writer position that Murphy was hired to fill, which was described in a February 12, 2014 email sent to Murphy by Caroline Clark, the ActioNet recruiter who handled the administrative tasks related to his hiring, had the same general description of duties as the description your affiant found, but it did not require a college degree, possibly because Murphy lacked a college degree. Clark told OIG that she got the PD for Murphy's position from the hiring manager, Purshina Patel, or someone in ActioNet's Human Resources department. A recruitment spreadsheet provided by ActioNet in response to a subpoena revealed Murphy's position paid $30,000 to $40,000, considerably less than the $50,000 to $85,000 listed for the other Technical Writers.

required a minimum DOE security clearance of building access only ("BAO"), which Murphy did not hold and could not obtain. Two ActioNet executives told the OIG it was known at the time of his hire that Murphy would not be able to obtain this security clearance because of his criminal record. Shortly after Murphy was hired, ActioNet began shifting him around to various positions in an attempt to find a job for him that he could actually perform.

81. In your affiant's opinion based on the investigation to date, there is probable cause to believe that such extortion occurred given the timing of Murphy's hiring in relationship to the renewal of the ActioNet contract, the abnormalities in the hiring process for Murphy, and inconsistent statements that Genebach and other ActioNet employees have made regarding Murphy's hiring.

82. On or about January 27, 2014, Adcock wrote an email from his DOE email account to Upperman's DOD account, "ActioNet is going to try to hire Cody into that position. Mike [Genebach] asked that I have Cody call him today." Additionally in the email, Adcock told Upperman "financial stability might mean the world of difference" when referring to Murphy getting a job at ActioNet. On or about that same date, January 27, 2014, Murphy sent an email with an attached resume to Genebach from the email account cody.murphy302@gmail.com. On or about that same date, January 27, 2014, Adcock used his DOE email account to send Murphy's resume and a resume template to himself at don.adcock@gmail.com and Upperman at dupperman04@comcast.net.

83. Adcock's DOE email account revealed that on or about January 28, 2014, Genebach sent an email from his ActioNet email account to Murphy at cody.murphy302@gmail.com referencing a previous telephone call, thanking him for his resume, telling him he "did a nice job conveying your current and former responsibilities, as well as your

skill set," and setting up an interview for the following week in which he said they would "discuss the position requirements and application process." Additionally, Genebach told Murphy the interview and job location were at 20300 Century Blvd., Suite 200, Germantown, Maryland. This was the office location of the ActioNet Energy Business Unit managing the DOE contract. On or about that same date, January 28, 2014, Murphy forwarded the Genebach email to Adcock at don_adcock2002@yahoo.com. On or about that same date, January 28, 2014, Adcock then forwarded the above-mentioned Genebach-Murphy email to Upperman's DOD email account and informed him Murphy had an interview at ActioNet.

84. On or about February 3, 2014, Murphy forwarded an email he had sent Genebach with an attached resume to Adcock at don.adcock@gmail.com from the email account cody.murphy302@gmail.com. Murphy's resume listed his address as 8904 Nancy Lane, Fort Washington, Maryland, the house solely owned by Adcock; his email was listed as cody.murphy302@gmail.com; his education was listed as pursuing a bachelor of science degree in Human Services from Phoenix University with an anticipated degree date of June 2015; and his previous work experience was listed as a tanning specialist and a lead bartender. On or about that same date, February 3, 2014, Adcock created the email account donald.adcock.doe@gmail.com, and added his DOE email address, donald.adcock@hq.doe.gov, to that Google account.

85. On or about February 4, 2014, Adcock emailed Upperman at his DOD email account and told him Murphy's ActioNet interview "went really well" and that Murphy was "supposed to contact Mike [Genebach] on Monday morning …."

86. Emails from Adcock's DOE email account reveal that on or about February 12, 2014, Caroline Clark, an ActioNet Corporate Recruiter, emailed Murphy at cody.murphy302@gmail.com with the email subject line "Technical Writer with ActioNet –

Germantown, MD." In Clark's email she told Murphy, "Below is our position description and online application for an opportunity we have supporting our Department of Energy contract in Germantown, MD. Please complete our application at your convenience." The email also provided a link to ActioNet's applicant website page and provided Murphy with a login ID and temporary password. On or about that same date, February 12, 2014, Murphy sent Clark an email from cody.murphy302@gmail.com telling her he had accidentally submitted his application online before he was finished filling it out and hoped "it does not mess anything up." On or about that same date, February 12, 2014, Murphy forwarded the above-referenced email he sent to Clark to Adcock at his DOE email account, don.adcock@gmail.com, and don_adcock2002@yahoo.com.

87. A review of subpoenaed ActioNet documents related to the hiring of Murphy reveal he was hired for a Technical Writer position billed to the DOE contract. This was a newly created position that was requisitioned by Genebach on February 12, 2014, had an applicant offer for Murphy requested on February 12, 2014, had that applicant offer approved by Genebach on February 12, 2014, and was closed on February 12, 2014.

88. Towards the beginning of Genebach's interview with OIG, before he was informed that the subject of the interview was Murphy's hiring, he was asked if he was involved in the hiring process for ActioNet contractors. He replied, "Mostly only for my direct reports at the program manager level." Genebach explained the general hiring process at ActioNet as follows, "A manager has a need, either a replacement or a new position. They'll write up a position description, um, either draft it from the contract requirements or, you know, draft it if it's a new project. They'll write up this PD and they'll work with a recruiter. It will be posted. There's a process where it has to be, you know, a position requisition is filed, which has to be approved and then, you know, they'll do interviews and whatever and then they'll hire. And so, um, I'll get involved in the

recruiting process in terms of approving the job requisition so the PD can be posted." Genebach was asked who decided which individuals were interviewed for a position and he stated, "That's the hiring manager," and he also said it was the hiring manager who generally decides who is hired for a particular position. Genebach was asked if he participated in the interview process for the staff level employees and he said, "No, not really. I mean I only participate. I do interviews for the highest level, you know the strategic positions … I wouldn't have enough time to participate in interviews at the lowest levels."[15]

89. When the OIG interview with Genebach turned to the subject of Murphy's hiring, he said Adcock "referred" Murphy for employment. Genebach remembered receiving Murphy's resume and said he "took his resume and forwarded it on to others who interviewed him." Genebach added that Murphy was "way too low level" to work directly for him so, "I would forward him on to others who might be able to look at his resume and see if he would fit a position." Genebach added, "But not, not on, not on the [DOE] contract because he didn't look, he didn't look strong enough to me to be, you know, um, um, applicable for any job on contract. I think, I think, um, Don [Adcock] thought he might work out as a help desk analyst and I didn't even see that on his resume." When asked to whom he forwarded the resume, Genebach said he sent it to Purshina Patel, Business Manager for the Energy Business Unit, as well as unnamed others. Based on the investigation, it appears that Patel was an unusual person for Genebach to select to manage

[15] Other ActioNet employees also describe Genebach as not typically being involved in the details of hiring lower-level employees. For example, Caroline Clark was assigned to the Energy Business Unit at ActioNet as a recruiter and handled administrative tasks in the hiring process to assist hiring managers to fill positions on the DOE contract, including during Murphy's hiring. Clark was asked in an OIG interview what types of positions Genebach was normally involved in for the hiring process, and she said "more senior level leadership roles" or an area where he wanted to "make sure the right hire had taken place."

Murphy's hiring, and both Genebach and Patel gave conflicting and changing statements about why she was involved.

90. Clark, the ActioNet Corporate Recruiter, told the OIG that the hiring manager that was assigned to a recruit position was usually the manager that had an opening on their team. Clark told the OIG she remembered Patel being associated with financial matters related to the DOE contract,[16] and sometimes she was involved in hiring decisions, mostly "senior leadership" or other "areas that needed particular attention" to make sure ActioNet had the "best hire coming through the door." Recruitment spreadsheets prepared by Clark covering the time frame from approximately the start of the contract in 2012 to May 2015 list Patel as the hiring manager for Murphy in his position as Technical Writer, but of the other five DOE Technical Writer positions listed on the spreadsheet as having been filled through hires, Patel was not the hiring manager on any of them. The spreadsheets reflect her as the hiring manager for other applicants that were hired for financial positions.

91. When Patel was asked in an OIG interview about Murphy's hiring, she said Genebach had given her Murphy's resume and asked her to "look it over … said this guy needs a break in life because he had a tough life or whatever … could we use him somewhere." Patel told the OIG that she had been the hiring manager who hired Murphy and was his supervisor "since day one." However, ActioNet personnel records for Murphy reveal he initially reported to a different supervisor than Patel and was moved multiple times between supervisors. In an OIG interview, Clark was asked about the individual listed as Murphy's initial supervisor, and she said that person was involved in Quality Assurance and that it seemed unusual that Murphy would

[16] Genebach also told OIG that the Business Manager for the Energy Business Unit worked with ActioNet project accountants to track the DOE contract finances.

report to her. Additionally, the information in Murphy's performance reviews that ActioNet provided in response to a subpoena does not appear to fit with a Technical Writer position even though it appeared Murphy was successively billed monthly to the DOE contract as a Technical Writer.

92. In addition to Genebach taking the unusual step of having Patel handle Murphy's hiring, Genebach also has provided inconsistent statements about who made the decision to hire Murphy for a Technical Writer position as opposed to some other lesser position not directly billed to the DOE contract and for which he was more qualified. During Genebach's interview with OIG, he was shown the February 12, 2014 email sent to Murphy by Clark in which Clark provided the link to apply for a Technical Writer position on the DOE contract and listed the duties of that position. Genebach was also told that according to Murphy's resume, he did not have a college degree and his work experience consisted of lead bartender and a tanning specialist. Genebach then stated, "No, I, I, I don't know why Caroline [Clark] picked the, uh, Technical Writer, but, so that's, you know, it was, it. I think she just had something for him to apply to." Genebach was then asked if he thought Murphy was qualified for that position, and he said, "He doesn't. He didn't look like a tech writer to me …." Genebach was then asked specifically about the technical duties listed for the Technical Writer position sent by Clark to Murphy, and he replied, "Yeah, the, the, reading the, what she put down there with all the 'Use Cases' and stuff like that seems a little bit above his, uh, his, his capability, but --" followed by a long period of silence. Contrary to Genebach's explanation of who decided Technical Writer was an appropriate position for Murphy, Clark told the OIG she remembered a meeting with her manager in which he gave her Murphy's resume and told her Murphy was someone "we're interested in" as a Technical Writer on the DOE

contract. Clark said her manager made it clear that Genebach had given him the resume and instructions to offer Murphy a Technical Writer position on the DOE contract.

93. When interviewed by OIG, Genebach denied hiring Murphy under pressure over the DOE contract. He said he "wasn't worried about the contract being in jeopardy." Towards the end of the interview with Genebach, when he was again directly asked why he hired Murphy, Genebach replied, "Well, I mean so we, um, you know, Don [Adcock] made the, um, the referral, and we met with him and, you know, uh, and you know, uh, I got a heart too." When Genebach was asked if he thought the hiring of Murphy would be returned with "favorable looks at the contract," he responded, "No. I don't know why I would think that. Why would I think that?" Patel also denied hiring Murphy under pressure over the DOE contract. She said, "Our contract was never at risk." However, neither Genebach nor Patel could provide an explanation for why ActioNet had hired Murphy for a DOE contract job that Genebach admitted to the OIG Murphy was not qualified for.

94. Genebach and Patel provided evolving and contradictory explanations to the OIG regarding why ActioNet hired Murphy for a DOE contract position that Genebach admitted was above Murphy's skill level, that Murphy appears not to have had the minimal educational requirements to fill, that Murphy did not have the ability to obtain a security clearance to qualify for, and that appeared to have been created, closed, and filled by Murphy all on the same date. Even Patel could not adequately explain to the OIG the contract need for Murphy's hiring or which ActioNet team had the Technical Writer opening that Murphy filled. The unusual circumstances surrounding Murphy's hiring and the inexplicable explanations for them provided by Genebach and Patel are consistent, in your affiant's opinion based on the investigation to date, with them having hired Murphy under undue pressure from Adcock. Accordingly, your affiant submits there

is probable cause to believe that Adcock used his official position at DOE as a means to extort ActioNet into hiring Murphy, in violation of 18 U.S.C. § 1951, during communications with Genebach or others at the company. Additionally, your affiant submits there is probable cause to search the Target Email Accounts for evidence of this crime given that Adcock and Murphy used varehodc@gmail.com, cmurphy42o@gmail.com, cody.murphy302@gmail.com, don.adcock@gmail.com, and don_adcock2002@yahoo.com to communicate regarding their personal and financial relationship or to communicate with each other, Genebach, or Upperman (including through Upperman's account dupperman04@comcast.net) regarding Murphy's application to ActioNet, and Adcock created donald.adcock.doe@gmail.com on the same date Murphy forwarded him the email Murphy had sent Genebach containing his resume.

## III. Preservation of Target Email Accounts

95. On May 23, 2016, preservation requests were issued to Yahoo, Google, and Comcast for donald_adcock2002@yahoo.com, cmurphy42o@gmail.com, varehodc@gmail.com, cody.murphy302@gmail.com, don.adcock@gmail.com, and dupperman04@comcast.net. A preservation extension request for these accounts was issued on August 17, 2016.

96. On July 6, 2016 a preservation request was issued to Google for donald.adcock.doe@gmail.com, and a preservation extension request for this account was issued on September 29, 2016.

97. In general, an email that is sent to a Yahoo, Google, or Comcast subscriber is stored in the subscriber's "mail box" on these email providers' servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on these email

providers' servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on these email providers' servers for a certain period of time.

## BACKGROUND CONCERNING EMAIL

98. In my training and experience, I have learned that Yahoo, Google, and Comcast provide a variety of on-line services, including email access, to the public. Yahoo, Google, and Comcast allow subscribers to obtain email accounts at the domain name yahoo.com, gmail.com, and comcast.net, respectively, like the email accounts listed in Attachment A. Subscribers obtain an account by registering with Yahoo, Google, and Comcast. During the registration process, Yahoo, Google, and Comcast ask subscribers to provide basic personal information. Therefore, the computers of Yahoo, Google, and Comcast are likely to contain stored electronic communications (including retrieved and unretrieved email for Yahoo, Google, and Comcast subscribers and information concerning subscribers and their use of Yahoo, Google, and Comcast services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

99. A Yahoo, Google, and Comcast subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Yahoo, Google, and Comcast. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

100. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

101. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

102. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically

retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

103. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol ("IP") addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email

account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## REQUEST FOR SEALING

104. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor fully known to all of the targets or potential targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

(Continued on Next Page)

## CONCLUSION

105. Based on the forgoing, I request that the Court issue the proposed search warrants. Because the warrants will be served on Yahoo, Google, and Comcast who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

Respectfully submitted,

______________________________________
Rebecca Freund
Special Agent
Department of Energy
Office of Inspector General

Subscribed and sworn to before me on ____________________________, 2016

________________________________________
UNITED STATES MAGISTRATE JUDGE